May 21, 2019

Re:     *State of Delaware v. Steven M. Snell*
        Def. ID# 1807000879
        <u>Bench Ruling</u>

This is my decision on Steven M. Snell's Motion to Suppress.  Snell is

charged with the following offenses:

1)      Home Invasion With the Intent to Commit a Violent Crime

2)      Three counts of Robbery in the First Degree

3)      Two counts of Carjacking in the First Degree

4)      Two counts of Kidnapping in the First Degree

5)      One count of Assault in the Second Degree

6)      Nine counts of Possession of a Deadly Weapon During the

Commission of a Felony

7)      One Count of Possession of Burglary Tools


The alleged victims of Snell's crimes are Stephen Scone and Helen Scone.

The Scones are married and in their early 80's.

<u>BACKGROUND</u>

1.      Snell had picked up theft and theft of a motor vehicle and burglary and

other charges on or about July 2, 2018 through July 7, 2018.  It appears that he

1

resolved these charges quickly, but was warned by the prosecutor or judge at the time if he returned to court he was facing six years in jail.

2. Snell was released from prison on or about July 26, 2018.

3. On July 28, 2018, Snell's grandfather took Snell to the Rehoboth Beach Park & Ride. Snell then went to the Scones' house, which is about one mile away in the Rehoboth Beach Yacht and Country Club. Snell and his grandfather had done some electrical work for the Scones several months earlier. The Scones paid Snell's grandfather in cash. Helen Scone believed that Snell had taken about $180 in cash from her purse when he was working at the Scones' house because Snell was working in the area where Helen Scone's purse was located. The logical inference is that Snell knew that the Scones kept cash in their home.

4. Snell got to the Scones' house sometime around 9:00 a.m. on July 28, 2018. Stephen Scone saw Snell outside. Snell wanted to come in and use the Scone's telephone. Stephen Scone let Snell do that. Stephen Scone heard Snell say into the phone it was "Steve," no its "Mike."

5. Snell and Stephen Scone then struggled in the kitchen. Snell had a box cutter type knife. Snell cut Stephen Scone on the chin. Snell then tied up Stephen Scone with a rope.

6. Snell then pulled Helen Scone down part of the stairway.

2

7. Snell took $200 to $260 in cash from the Scones. Snell also got the Scones' M&T Bank card and personal identification number.

8. Snell then put Stephen Scone in the trunk of the Scones' Mercedes. It was a hot July day. Snell forced Helen Scone to get in the front seat of the Mercedes. Snell then drove off with the Scones. Snell was driving erratically, prompting Helen Scone to tell Snell to slow down. Snell told Helen Scone, "do you want me to pull my gun out?"

9. Snell drove to the M&T Bank in Rehoboth Beach that is located near the Camelot Mobile Home Park and at a small shopping center that has a Subway store in it. Snell and Helen Scone went to the ATM and got $500 out of it. The ATM took a picture of Snell and shows his forearm with three large star tattoos on it. As Snell and Helen Scone left the ATM, Helen Scone grabbed a railing outside the bank and refused to let go. Snell tried to pull Helen Scone away, but gave up when another bank customer came up and asked what was going on.

10. Snell got back in the Scones' Mercedes and drove around to the back of the shopping center with Stephen Scone still in the trunk. Snell then apparently fled on foot. Stephen Scone was able to untie himself and get out of the trunk. Pictures taken of Stephen Scone at the time show blood on his chin and clothes. Stephen Scone was tied up so tightly there were rope marks on his arms and legs.

3

11. Helen Scone told the police that Snell (who was not yet identified) was really shaking a lot and seemed to have some medical condition. The police did a computer search under various medical conditions and got Snell's name in a response to an inquiry for Turette's. The police pulled up Snell's arrest information from his prior arrests and saw a picture with three large tattoos on Snell's forearm. The police got Snell's criminal history and noted the escalation in the seriousness of his offenses. The police also learned that Snell had been recently released from prison and that he was facing six years in jail if he returned.

12. The police were very concerned about the threat that Snell posed to the public at large and to the Scones. The police were very concerned that since Snell was now apparently on foot that he might carjack another vehicle. Their concerns were heightened by the fact that Snell apparently fled on foot near a mobile home park that has a number of senior citizens in it. Snell had apparently victimized the senior citizens in the past.

13. The police very much wanted to find Snell quickly. The police went to Snell's last known address but did not find him there. The police contacted Snell's mother, who was cooperative. Snell's mother gave the police Snell's cell phone number. Snell's mother was exchanging texts with Snell. Snell told his mother he was at the Indian River inlet with a female friend. The police went there but did not

4

find Snell. The police had upwards of ten officers working, in one way or another, to investigate the case and locate Snell. The Scones were very afraid that Snell would return to their home. Stephen Scone asked the police if he should get a gun to protect himself and his wife.

14. The police quickly exhausted their typical means of finding wanted persons and began considering using a cell site locator. The police did not feel that they could get a search warrant issued by a Superior Court judge quickly enough under the circumstances. It is apparently Delaware State Police policy to only use the Superior Court for cell site locator warrants. It was a Saturday in the busy summer season. Delaware State Police would have had to find a Deputy Attorney General to assist in the preparation of the search warrant application and then find a Superior Court judge to approve it. The police thought it might take eight to twelve hours to get a search warrant. The search warrant then would have to be submitted to T-Mobile, Snell's cell phone carrier. Delaware State Police's past experience was that T-Mobile does not rapidly respond to such warrants quickly on the weekends. The Delaware State Police feared the warrant would just sit until Monday and then go into a "cue" for processing.

15. The Delaware State Police decided to request cell phone location date from T-Mobile based on exigent circumstances. The Delaware State Police have a

5

process for this that, at least in this case, required approval from John McColgan, a Delaware State Police criminal lieutenant at Troop 4 in Georgetown, Delaware who oversees all detectives in Sussex County and finally by David Sponaugle, a Delaware State Police lieutenant in charge of the Criminal Intelligence Section, which includes, among other units, the electronic surveillance unit. Officer Sponaugle stated that the cell site locator is used very sparingly on a exigent circumstance basis, stating that it was used 7-8 times in 2018, with this being one of those times. McColgan and Sponaugle approved the request to obtain Snell's location date from T-Mobile without a warrant. T-Mobile requires certain information in writing.

16.    Both McColgan and Sponaugle, based on the facts I have recited, felt that there were exigent circumstances to justify a warrantless search for the location of Snell's cell phone. Both believed that Snell posed an imminent threat to both the public at large and to the Scones.

17.    The Delaware State Police sent the written request with the required information to T-Mobile at 17:58 (5:58 p.m.) and had located and arrested Snell by 19:13 (7:13 p.m.).

## THE EMERGENCY DOCTRINE

Generally, you have to get a search warrant to track electronically the location of a person's cell phone. The Emergency Doctrine is an exception to this. To use this

6

exception, the police must show the following:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property. (2) The search must not be primarily motivated by intent to arrest and seize evidence. (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*Guererri v. State*, 922 A.2d 403 (D. Supr. 2007).

(1)     I do find that the police had reasonable grounds to believe that there was an emergency at hand and an immediate need for their assistance for the protection of life. Put another way, I find that the police had reasonable grounds to believe that Snell presented a dangerous threat to anyone he came into contact with and presented a dangerous threat to the Scones. I have reached this conclusion based on the following:

1.     Snell had an urgent need for money and was willing to expose himself to serious criminal offenses and penalties in order to get it.

2.     Snell was also facing serious consequences for violating his probation. Snell committed multiple serious theft offenses in early July, 2018. Snell quickly resolved those offenses and was told that he faced six years in jail if he returned. Snell got out of jail on or about July 26, 2018. In less than 48 hours, Snell planned to rob the Scones and did in

7

fact rob the Scones of less than $800. In doing so, Snell invaded the Scones' home, assaulted the Scones, kidnapped the Scones, carjacked the Scones' car, put Stephen Scones in a car trunk on a hot summer day, and threatened to use a gun on Helen Scones. Snell used a box cutter to cut Stephen Scones.

3. Snell committed enough serious offenses against the Scones to, if convicted, spend the rest of his life in prison. Snell also faced violation of parole charges that apparently carried a six year sentence. Put another way, Snell had little to lose in terms of criminal deterrence.

4. After Snell committed these offenses, he fled on foot near a mobile home park populated, to some extent, by senior citizens. Snell was believed to have a knife and gun because the police did not find them in the Scones' car. Snell demonstrated his willingness to use the knife to cut an older man and had threatened to use the gun on an older woman. So, to sum it up, Snell was on foot, believed to have a knife and gun with an actual and expressed willingness to use them, and in all likelihood on the hunt for more money in a deeply populated resort area packed even deeper with tourists. I note, as did the police, that Snell's criminal behavior had escalated dramatically in a very short period of

8

time. Quite frankly, when you have a person who has invaded a home and assaulted and kidnapped the homeowners, I think there is every reason to believe that the person may well engage in even more serious conduct.

I also find the police had reasonable grounds to believe that Snell presented a threat to the Scones. I say this for two reasons. One, Snell knew the Scones had money. Snell had stolen from them once before and robbed them a second time even though it was highly likely the Scones might ultimately identify Snell. You might think, if you were rational, Snell would stay away from the Scones. However, Snell knew they kept cash at their home and they were, because of their ages, easy to victimize. Snell wanted money badly. Two, the Scones were the best witnesses to crimes that could put Snell in jail for life. That also put them at risk.

(2)     I conclude that the search for Snell's cell phone was not motivated primarily by the intent to arrest Snell or seize evidence. The police wanted to prevent Snell from harming anyone else. Arresting him is, of course, the logical extension of that. However, that is all it is. There is no doubt that the overriding concern here by the police was to protect the public and the Scones from Snell.

(3)     I do find that there is a reasonable basis, approximating probable cause, to associate the emergency with the item to be searched, which was Snell's cell

9

phone. The police certainly had probable cause to find that Snell had committed a number of various serious offenses. The police had reasonable grounds to believe that Snell posed an imminent threat to anyone he came into contact with. The police knew Snell was using his cell phone because Snell was texting with his mother. Therefore, the police had reasonable grounds to believe that if they located the place where Snell's cell phone was that they would also find Snell. Thus, searching for Snell's cell phone made all the sense in the world.

## CONCLUSION

I find that the police have met all three requirements for conducting a warrantless search. Snell's Motion to Suppress is DENIED.

FILED PROTHONOTARY
SUSSEX COUNTY
2019 MAY 21 P 12:49